UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:9:22-cv-80548

STEVEN STONE,

        Plaintiff,

v.

CAROLYN MUSICO as trustee,
DAVID STONE, and CHRISTINE G. STONE,

        Defendants.

_____/

## COMPLAINT

Plaintiff Steven Stone ("Steven" or "Plaintiff"), by his attorneys, Pryor Cashman LLP, as and for his Complaint against Defendants Carolyn Musico ("Ms. Musico" or the "Trustee"), David Stone ("father" or "David"), and Christine G. Stone ("mother" or "Christine," and, together with Ms. Musico and David, the "Defendants"), respectfully alleges as follows:

## NATURE OF THE ACTION

1. This action arises from Defendant Carolyn Musico's breach of her fiduciary duty as trustee of the Stone 2016 Family Trust (the "Trust") and the scheme devised by Steven's parents, Defendants David Stone and Christine G. Stone, to induce that breach.

2. Immediately after graduating from college, Steven joined his parents at the Stone family business, Oceanside Mortgage Company, Inc. ("Oceanside," the "company," or the "family business"). Steven effectively began running the company in or around June 2008. This allowed Steven's parents to semi-retire, although Steven's father retained ultimate control of the company's affairs through his 90.1% ownership of the company's stock and the title of Chief Executive Officer.

3. In 2016, the Trust was established under Florida law for the benefit of Steven and his children, as a reward for Steven's successful contributions to Oceanside.

1

4. Steven was appointed the trustee of the Trust. As the Trust's settlor, Steven's father retained the ability to remove or replace the Trust's trustee at will.

5. The primary asset placed into the Trust was a 9.9% equity interest in the company, which, in addition to the value of the capital stock, also generated significant income for the Trust through Oceanside's profit distributions.

6. Oceanside was extremely successful under Steven's stewardship. For example, in 2020 (the last year for which audited financials are available), the Company distributed more than $22 million in profits to its shareholders.

7. In mid-2021, Steven's relationship with his parents broke down in significant part because Steven had become increasingly vocal within the family about his father's personal, professional, and business misconduct. Not accustomed to being questioned, and armed with enormous financial resources, Steven's parents informed him in no uncertain terms in the summer and fall of 2021 that his outspokenness would have consequences should he persist.

8. In November 2021, they made good on their threat. While Steven was on vacation with his wife and two young children, his parents fired him ("without cause" under his employment agreement) and locked him out of the family business—the only job he had held for nearly 16 years, and on which his and his family's livelihood depended.

9. Around the same time, his father replaced him as trustee of the Trust and appointed as successor trustee Ms. Musico, who was Steven's mother's relative and close friend.

10. Shortly thereafter, David sought to acquire the company shares held in the Trust by purporting to exercise a right in the shareholders agreement to repurchase the shares at *the same price* the Trust had paid in 2016.

11. Yet that position was completely unsupported by the governing documents. It also would have yielded a windfall to David because the company had significantly increased in value since 2016.

12. While it was in Steven's parents' personal interest to repurchase the Oceanside shares at a low price, there was another, more important motive for them to pay as little as possible: With Steven now unemployed and effectively cut-off from the Trust's income, his parents knew that he would likely start his own mortgage company—a competing business. And because he was (and is) not contractually prohibited him from doing so, his parents needed to ensure that the Trust's assets were not used directly or indirectly (through profit distributions) to fund a competitor to Oceanside.

13. Notwithstanding the shock and disappointment of his parents' treatment of him, from November 2021 through January 2022, Steven attempted to resolve the dispute, including by discussing with his parents' representatives whether and at what price his father might repurchase the Trust's shares.

14. For her part, the Trustee, Ms. Musico, by and through her Florida attorney, R. Lee McElroy IV ("McElroy"), gave every indication that she was content to leave the Stone family to work out its own problems. On the critical question of the sale price of the shares, Ms. Musico and her counsel confirmed that Steven's father was not entitled to repurchase the shares at the 2016 price, and, thus, that the Trust was free to try to maximize their value in any sale.

15. At Steven's urging, the Trustee's counsel agreed in January 2022 to confirm that position in writing in a letter to David.

16. However, while Steven waited weeks for the Trustee to send this promised letter, unbeknownst to him, Ms. Musico and Steven's parents were secretly negotiating a sale of the shares

behind his back. For nearly five weeks, Ms. Musico and her counsel pretended that the Trustee was simply delayed in sending the promised letter, so as to misdirect Steven.

17.  This ruse continued until February 11, 2022 (a Friday), when McElroy wrote to Steven's counsel "apologiz[ing] for the delay," reversing course and informing him for the first time that the promised letter would *not* be sent, and "encourage[ing]" Steven to "deal directly with [his parents' counsel] to try to resolve" the matter of the share sale.

18.  In truth, a deal was already done.

19.  On February 15, 2022 (a mere two business days after February 11), Ms. Musico secretly executed a purchase-and-sale agreement, selling the Trust's shares to David at an artificially depressed price. The agreement's closing period for delivery of the shares to David was "within ten days of execution," or no later than February 24, 2022.

20.  To ensure that Steven did not have the opportunity to interfere and seek court intervention to enjoin the sale before the 10-day closing period elapsed, the Trustee and her counsel, at the urging or with the consent of Steven's parents, deliberately withheld from Steven for exactly 10 days the existence of the purchase-and-sale agreement, despite being in email contact with Steven's counsel during that time.

21.  This omission by the Trustee and her counsel is telling:  Since the Trust's potential sale of the shares to David was the singular focus of counsels' discussion for months to that point, neither the Trustee nor McElroy could have failed to recognize the importance of the fact or the effect of withholding it. What's more, the Trustee and her counsel had just days earlier suggested to Steven that he be the point person to negotiate any deal with David.

22.  In lieu of candor, during the 10-day period between executing the sale contract and closing, the Trustee's counsel reverted to his earlier tactics in avoiding phone calls and emails from

4

Steven's counsel. At the time, Steven's counsel was completely unaware of the purchase-and-sale agreement and was following up with McElroy on the latter's February 11 letter to try to understand why the Trustee had abruptly changed course and declined to send the long-promised letter.

23. After a 10-day dodge, the Trustee's counsel finally responded substantively on February 24, 2022, forwarding to Steven's counsel by email a copy of the 10-day old purchase-and-sale agreement for the first time. By then, it was too late for Steven to do anything about it. The sale had closed and already significantly and unnecessarily diminished the value of the Trust, to Steven's detriment.

24. Because the Trustee understood that her decision to sell the shares below fair value, as well as her calculated subterfuge surrounding it, likely would trigger a lawsuit, Ms. Musico sought to insulate herself from the consequences of her misconduct.

25. To that end, Ms. Musico negotiated for and obtained in the share purchase-and-sale agreement *a full indemnity* from David—the Trust's supposed arms-length counterparty and the person who benefited most from the Trustee's decision to sell the shares at less than fair value. That the Trustee specifically sought and obtained an indemnity from David in such circumstances to protect herself *personally* from claims based on her breach of fiduciary duty speaks volumes about whose interests she was truly protecting.

26. And Steven's parents offered the indemnity to the Trustee specifically because they knew it would induce her to sell the Trust's shares to them at a favorable price, to Steven's detriment.

27. Ms. Musico, as a fiduciary, owed a duty to Steven to manage the Trust's assets for his benefit, preserving and maximizing the value of those assets. Ms. Musico was not entitled to

5

sacrifice the value of the Trust's assets in order to appease or benefit anyone else. Yet she flagrantly breached that duty by placing Steven's parents' interest, and her own, above Steven's.

28. Steven brings this action to hold the Trustee to account for her rank faithlessness and breach of duty, along with those who aided and abetted her misconduct.

## THE PARTIES

29. Plaintiff Steven is an individual residing at all relevant times at 1 Captains Pointe Way, Fair Haven, New Jersey. He is the primary beneficiary and former trustee of the Stone 2016 Family Trust.

30. Defendant Carolyn Musico is the Trustee of the Trust.

31. Defendant David Stone is Steven's father and the Grantor of the Trust.

32. Defendant Christine G. Stone is David's wife and Steven's mother.

## JURISDICTION AND VENUE

33. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are of diverse citizenship. Steven is domiciled in the State of New Jersey, while each of the Defendants is domiciled in the State of Florida.

34. The Court has personal jurisdiction over Defendant Carolyn Musico because, among other things: (a) Ms. Musico is a citizen of the State of Florida, domiciled at 4490 Danielson Drive, Lake Worth, Florida; (b) Ms. Musico has demonstrated no intent to relinquish her domicile, and she spends most of her time in the State of Florida; (c) Ms. Musico is registered to vote in the State of Florida; and (d) a substantial part of the wrongful acts committed by Ms. Musico occurred in the State of Florida, including her mismanagement of, and breach of duty to, the Trust, her and her

agents' communications with Steven and his parents, and her execution of documents that wrongfully and unlawfully depleted the value of the Trust.

35. The Court has personal jurisdiction over Defendants David Stone and Christine G. Stone because, among other things: (a) David and Christine are both citizens of the State of Florida, domiciled at 101 Harbor Way, Hobe Sound, Florida; (b) each has demonstrated no intent to relinquish their domicile, and each continues to spend much of his/her respective time in the State of Florida; (c) David and Christine are both registered to vote in the State of Florida; and (d) David and Christine intentionally directed their wrongdoing at the State of Florida, including by inducing a Florida-domiciled Trustee's breach of duties, communicating with Florida residents to facilitate that breach, and negotiating documents with Florida attorneys and residents with the intent to harm the beneficiary of a Florida-managed Trust.

36. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because each of the Defendants resides in this District and a substantial part of the events giving rise to Steven's claims occurred in this District. In addition, the Trust has been injured in this District as a result of the Defendants' wrongful conduct.

## STATEMENT OF FACTS

### I. Oceanside Mortgage Company & Establishment of the Trust

37. Oceanside is a New Jersey corporation. It offers mortgages to individuals looking to purchase and refinance homes in 47 states, and its principal office is located at 55 Main Street, Toms River, New Jersey 08753.

38. Oceanside is a closely-held family business, founded by Steven's parents. Until recently, Steven had dedicated his entire professional career to the family business. He started working at the company after graduating from college. While his father retained the formal title of

CEO of Oceanside, Steven began running the day-to-day operations of the company in or around June 2008 so that his parents could take a step back from it and semi-retire.

39. The change was a positive one for the entire family—Steven was enthused to assume the additional responsibility, and his parents appreciated both his successful handling of the family business, as well as the increased leisure time it allowed them.

40. In recognition of Steven's success with the business, and to incentivize him to continue working at the company, Steven's parents decided in 2016 to give him the economic benefit of a 9.9% equity interest in the closely-held company. Steven's father owned, and continues to own, the remaining equity interest in the company.

41. To convey the shares, Steven's parents set up the Trust to hold the equity interest for Steven's benefit. The Trust was established on June 30, 2016, and is governed by Florida law. A true and correct copy of the governing document for the Stone 2016 Family Trust is attached hereto as **Exhibit A** and incorporated herein by reference.

42. On June 30, 2016, Steven's father made a gift of 1.0% of the company's stock to the Trust. On July 1, 2016, he sold an additional 8.9% of the company's stock to the Trust in exchange for a promissory note for $694,200.00 (the "2016 Note").

43. Steven is the primary beneficiary of the Trust, and his children are beneficiaries upon his death. Steven's father appointed him as trustee, and Steven entered into the documents with his father to effectuate the sale of the shares to the Trust.

44. As further recognition of his leadership within the family business, Steven was given the title of Chief Operating Office in May 2018.

45. At the same time, the Trust entered into a shareholders agreement with David and the company on May 10, 2018 (the "Shareholders Agreement"). Steven's father entered into the

Shareholders Agreement on behalf of the company, and Steven entered into it on behalf of the Trust. The Shareholders Agreement gives the Trust the right to receive shareholder distributions, and the company has regularly made such distributions to the Trust.

46. Under Steven's leadership, the company has been very profitable. In 2020 alone, Oceanside generated $22,191,008 in pre-tax profits. During that single year, the Trust's portion of the company's profits was $2,219,100.

47. Unsurprisingly, the value of the company increased, as well, thanks in large measure to Steven's leadership. For example, in 2018, a third party offered to buy the company for $22,000,000, which Steven's parents declined. By 2021, an internal term sheet prepared in response to Steven's offer to buy the business showed the business had further grown to an enterprise value of approximately $28,100,000.

## II.   The Relationship Between Steven and His Parents Deteriorates

48. In or around October 2020, Steven started taking issue with some of his father's decisions and behavior, personally, professionally and at Oceanside.

49. Steven's concerns began with the content of certain emails that his father had sent to a third party. David acknowledged those concerns and agreed to have his outgoing e-mails reviewed by Steven going forward.

50. In January 2021, Steven expressed legitimate concerns to his father about certain financial policies and practices at the company.

51. In June 2021, Steven pushed for improved legal compliance at the company, with proper adherence to continuing education requirements for mortgage originators and control persons.

52. Outside of their relationship at the company, Steven and his parents had also had family disputes, based on which, together with the other issues Steven had raised, his parents had made it clear could threaten his continued employment at Oceanside.

### III.    Steven's Parents Retaliate Against Steven

53. Steven did not back down in response to these threats, and his parents did retaliate.

54. On November 12, 2021, they locked him out of the company, and later fired him.

55. Oceanside terminated Steven's employment "without cause."

56. Steven's father, as the Grantor of the Trust, also removed Steven as trustee. In Steven's place, Ms. Musico, Christine's former secretary, was appointed as trustee.

57. Ms. Musico had worked for Steven's mother for many years before retiring.

58. Ms. Musico and Steven's mother were also distant relatives and close friends. They regularly had dinner together, traveled on vacation, and attended concerts and other events.

59. Steven later received notice that he had been replaced as trustee.

60. To punish Steven even further, his parents then set out a plan to steal the company's stock back from the Trust, which had increased in value significantly over the prior six years. At this time, the 9.9% interest in the family business remained the primary asset in the Trust.

61. On December 16, 2021, Steven's father wrote a letter to the Trust demanding that it allow him to repurchase the company shares that it held. He asserted that, under a 2018 employment agreement between the company and Steven and the Shareholders Agreement (together, the "2018 Agreements), the company had a right to repurchase the shares immediately, and at an artificially depressed fixed price (as defined in the Shareholders Agreement, the "Agreed Value").

62. Specifically, Steven's father wanted to allow the company to repurchase the shares at the Agreed Value, which would essentially allow the company to repurchase the shares at the exact

same price it sold them for six years earlier, without accounting for the increase in the fair value of the shares in the interim. The Agreed Value was a default price under the 2018 Agreements, and the 2018 Agreements provided that the Agreed Value would be subsequently replaced with a regularly re-valuated amount.

63. Acting as the new trustee, Ms. Musico was in the pocket of Steven's parents and carried out their bidding. At David's request, she sold the company stock in the Trust back to the company at a fraction of the fair market value, using a low multiple of the Agreed Value to determine the sale price.

64. The share repurchase was executed by Ms. Musico and David, acting on behalf of the company, on February 15, 2022. The transaction closed February 24, 2022.

65. Upon information and belief, Ms. Musico never hired or solicited any third-party to conduct a valuation of the company or the shares; she never requested information from the company concerning its finances, assets or value to determine fair value of the company or the shares; nor did she ever seek competing bids to see if she could obtain a better price for the shares. Instead, Ms. Musico simply sold back the shares at the parents' request, all the while misleading Steven about what was happening.

IV. **The Trustee and Steven's Parents Deceived Steven and Sold the Company Shares in Secret**

66. In mid-November 2021, Steven learned of his father's stated intention to repurchase the shares from the Trust using the Agreed Value, which Steven opposed. Steven disagreed with his father's interpretation of the 2018 Agreements and did not believe that the company could repurchase the shares at the artificially low Agreed Value.

67. Steven, through counsel, attempted to persuade the Stones that their interpretation of the 2018 Agreements was wrong, and in the alternative, sought to negotiate a resolution that would allow the company to repurchase the shares at a fairer price.

68. Steven's counsel proposed hiring a neutral appraisal firm to value the company and the shares. Steven's parents refused, insisting that they were not obligated to pay more than the Agreed Value. After additional discussions, David's best offer was approximately twice the Agreed Value, still a significantly undervalued purchase price.

69. Ultimately, Steven sought a global resolution to his dispute with his parents over issues related to both the company and the Trust. Steven continued those negotiations with his parents in good faith from mid-November 2021 through January 2022. Steven's father and mother appeared to Steven to be negotiating with him in good faith, even if the two sides failed to reach a resolution.

70. However, Steven was unaware that his parents were simultaneously going behind his back to attempt to repurchase the shares through the Trustee, his mother's former secretary and close friend. Without telling Steven, his father had written to the new trustee, Ms. Musico, on December 16, 2021, asserting that the Trust had defaulted on the 2016 Note used to purchase the 9.9% interest in the company and owed approximately $780,000.00. His father demanded either payment on the 2016 Note or the return of the shares to the company using the artificially depressed Agreed Value to value the shares.

71. Steven did not learn of his father's demand until on or around December 30, 2021. During his negotiations with his parents before that date, Steven suspected nothing about the clandestine transaction, believing both he and his parents were trying to come to a resolution in good faith.

72. Having learned of the cloak-and-dagger move, counsel to Steven informed the Trustee that same day that the 2018 Agreements did not permit a repurchase of the shares at the Agreed Value, as Steven's father desired. Moreover, counsel noted that the Trustee's delay in notifying Steven of the demand letter smacked of impropriety.

73. As additional follow-up, Steven's counsel wrote to the Trustee on January 4, 2022. In that letter, counsel explained in detail that David's right to repurchase was far from clear and, in any event, that the Agreed Value did not control the price if there was a repurchase by Steven's father. A true and correct copy of the January 4, 2022 letter (the "January 4 Letter") is attached hereto as **Exhibit B** and incorporated herein by reference.

74. In multiple conversations with Steven's counsel, the Trustee's counsel, McElroy, said that he agreed with Steven's analysis concerning any potential sale price of the shares. In January 2022, McElroy informed Steven's counsel that he planned to send a letter on behalf of the Trust adopting the same position—that Steven's father did not have a contractual right to repurchase the shares at the depressed Agreed Value.

75. As to Steven's father's demand for payment on the 2016 Note, Steven's counsel informed the Trustee's counsel that there were several reasons why that possibility did not threaten the Trust. First, the Trust had recently sold certain real estate, which left it with about $500,000 in cash that could be used to pay off most of the 2016 Note. Second, the amount David had said was owed was mistakenly high, since it included interest on the 2016 Note that had already been paid off. Steven provided documents evidencing the interest payments to the Trustee. Third, given the significant value of the shares, Steven personally (and as the Trust's primary beneficiary) was willing to contribute additional capital to the Trust to help repay the 2016 Note so that no default would occur. This potential arrangement was in the beneficiaries' best interest because the value of

the shares far exceeded what was owed under the 2016 Note. Even if Steven had to contribute approximately $300,000.00 to pay off the 2016 Note, the Trust could expect to realize a greater net value from a sale of the shares at fair value.

76. Approximately four weeks passed after the discussion between Steven's counsel and McElroy about informing Steven's father that the repurchase should not proceed as planned. Steven and his counsel understood during this time that McElroy was preparing the letter.

77. Steven's counsel reached out to McElroy repeatedly during that time to confirm whether the letter had been sent. In response, McElroy provided excuse after excuse for counsel's delay.

78. For example, counsel scheduled a call for January 5, 2022, but McElroy did not pick up when Steven's counsel called at the arranged time.

79. Steven's counsel then asked to speak to McElroy on January 7, 2022. McElroy said he was in a deposition but could speak either later in the day or over the weekend.

80. Steven's counsel finally spoke to McElroy on January 11, 2022. During the call, McElroy indicated that he agreed with the January 4 Letter insofar as the low Agreed Value did not apply to David's attempted repurchase of the Trust's shares.

81. On January 24, 2022, McElroy responded to an update inquiry from Steven's counsel by saying that he was still drafting the letter to the Stone's counsel but had been delayed because of a trial in another matter. Steven's counsel offered to allow McElroy to copy and paste portions of the January 4, 2022 letter counsel had sent in order to help expedite the letter.

82. On February 1, 2022, McElroy wrote in an email to Stephen's counsel that he was close to finishing the drafting of the letter and would complete it that week.

83. In total, there were nearly a dozen e-mails or phone messages sent to or left with McElroy, and nearly as many excuses from McElroy offered to justify his delay in sending the long-promised correspondence.

84. Because Steven and his counsel understood that his father's offer was still more than $2,000,000 below fair value, they waited for McElroy to send the letter, asserting that the Agreed Value was not the appropriate valuation to assign the Trust's shares.

85. On Friday, February 11, 2022, McElroy sent a letter to Steven's counsel, with no forewarning and after six weeks of stringing Steven's counsel along, to inform Steven that the Trustee no longer planned to send the long-promised letter to David. Instead, he encouraged Steven's counsel "to deal directly with Mr. Hennessey [David's counsel] to try to resolve this . . . ." A true and correct copy of the February 11, 2022 letter (the "February 11 Letter") is attached hereto as **Exhibit C** and incorporated herein by reference.

86. Unbeknownst to Steven or his counsel, the following Tuesday, February 15, 2022, the Trustee executed an agreement with David to sell the shares at approximately twice the Agreed Value—the deal Steven's parents had proposed and that Steven had rejected. In fact, the Trustee knew Steven had already rejected that same offer. The transaction between the Trustee and Steven's father closed within 10 days of the date on which the agreement was executed. A true and correct copy of the February 15, 2022 agreement (the "Repurchase Agreement") is attached hereto as **Exhibit D** and incorporated herein by reference.

87. During that closing period, Steven's counsel chased McElroy to try to figure out why the Trustee had reversed course. The last time they had spoken McElroy had reiterated his intent to send the letter to Steven's father saying the valuation of the shares should not be pegged to the Agreed Value, and McElroy had made *no mention* of any negotiations or draft agreements with

Steven's father to sell the shares. For over a week, McElroy ducked phone calls and dodged e-mails, giving no substantive response to Steven's questions.

88. Not until the final day of the closing period, February 24, 2022, did McElroy finally respond by forwarding Steven's counsel a copy of the Repurchase Agreement. By that point, it was too late for Steven to do anything about the sale because the Repurchase Agreement had closed. A true and correct copy of the February 24, 2022 letter and accompanying email (the "February 24 Letter") is attached hereto as **Exhibit E** and incorporated herein by reference.

89. As if to leave no doubt about her breach of fiduciary duty, Ms. Musico negotiated a broad indemnity for herself as a part of the transaction with Steven's father, the Trust's counterparty in the transaction. The indemnity for the Trustee was integrated into the Repurcahse Agreement and ensured that Steven's father would indemnify the Trustee for any claims that might be brought against her, including those brought by the beneficiaries arising out of or related to her decision to sell the shares to Steven's father at the deflated price. *See* Exhibit D, p. 5 ("David hereby agrees to indemnify and hold harmless Carolyn, individually and as Independent Trustee of the 2016 Trust, including her respective agents, heirs, executors, administrators, conservators, successors and assigns, against all known or unknown loss of any kind or nature whatsoever that may arise out of, in connection with, or by reason of, this Agreement, including, without limitation, attorneys' fees (including legal fees incurred in defending a claim brought by a third-party and/or legal fees incurred in enforcing and/or defending this indemnification), expenses and costs and further agrees to pay them as they become due.").

## FIRST COUNT
**Breach of Fiduciary Duty – against Trustee**

90. Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if more fully set forth herein.

91. The Trust provides that it is governed by Florida law. *See* Exhibit A, p. 39.

92. The Trust by its express terms is irrevocable, and David as the grantor retained no interest in the Trust. *See* Exhibit A, p. 49.

93. The Trust provides that Steven is the Primary Beneficiary of the Trust and as the Primary Beneficiary, the Trustee's primary duty is owed to Steven. *See* Exhibit A, pp. 1, 22. Pursuant to the Florida Trust Code, Florida Statutes Section 736.0101 *et seq.*, Steven is a qualified beneficiary.

94. As trustee of the Trust, Ms. Musico entered into a fiduciary relationship with the beneficiary of the Trust, Steven. This relationship created a duty on the part of Ms. Musico to act for Steven's benefit with regard to issues concerning the Trust and the Trust's assets.

95. The language of the Trust's governing document reiterates this obligation. It expressly obligates Ms. Musico to prioritize Steven's needs. *See* Exhibit A, p. 22 ("In making any Discretionary decision or exercising a power of appointment, my Trustees shall give primary consideration to the needs of the Primary Beneficiary . . . .").

96. The Trustee has a duty "to act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries." Fla. Stat. §§ 736.0105(2)(b), 736.0801.

97. The Trustee breached her fiduciary duty by selling all or substantially all of the Trust assets to her friend at a below market price in breach of her fiduciary duties owed to Steven.

98. The Trustee's actions breached the duty of loyalty owed to Steven pursuant to Florida Statute Section 736.0802, and thus breached her fiduciary duty to Steven.

99. Ms. Musico breached her fiduciary duty when, at the behest of a non-beneficiary, she entered into a transaction that sold Trust property at a deflated price. She made that sale despite being aware of alternatives that would preserve more of the value of the shares and, on information

and belief, without having fully considered the relative merits of those or any other alternatives. Ms. Musico entered into this transaction, not for the benefit of the Trust's beneficiary, but rather for David as the Grantor of the Trust, in essence, because her friend and old boss, Christine, wanted her to do it.

100. In selling the shares to Steven's father, Ms. Musico also intentionally frustrated Steven's attempts to obtain a greater value for the Trust's assets. She and her agents, not only avoided telling Steven of the possible sale despite their ongoing correspondence, but specifically misled him about her intentions to seek a greater value for them. Ms. Musico further frustrated any attempt by Steven to preserve the value of the shares during the closing period by refusing to provide him with any information about the proposed transaction.

101. Ms. Musico's actions resulted in a loss of value to the Trust's assets, and thus harmed the Trust's primary beneficiary, Steven.

**SECOND COUNT**
**Aiding and Abetting Breach of Fiduciary Duty – against David Stone & Christine G. Stone**

102. Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if more fully set forth herein.

103. David and Christine G. Stone both were aware that Ms. Musico was allowing the company to repurchase the shares at an artificially depressed price, despite alternative arrangements that could have been made. Indeed, they had chosen Ms. Musico as the new trustee for the very purpose of subverting the Trust's purposes by using the Trust to punish Steven for his perceived wrongful conduct towards them.

104. David and Christine, not only knew of the Trustee's breach of her fiduciary duties, but also substantially assisted her in that breach. They appointed Ms. Musico as the new trustee when they became angry at their son and wanted to punish him. They then worked to arrange and

close a deal to repurchase the company shares with Ms. Musico, while at the same time concealing that transaction from Steven and his counsel.

105. By planning to disgorge the Trust of much of its value, and then collaborating with Ms. Musico to do so, David and Christine aided and abetted the Trustee's breach of duty and harmed Steven's beneficiary interest in the Trust.

**WHEREFORE**, Plaintiff Steven Stone demands judgment against Defendants Carolyn Musico, David Stone, and Christine G. Stone, jointly and severally, as follows:

a. For an award of compensatory damages;

b. To compel the Trustee to restore the property to the Trust;

c. For an award of pre- and post- judgment interest;

d. For removal of the Trustee;

e. To appoint a special fiduciary to take possession of the Trust property and administer the Trust;

f. To void the wrongful acts of the Trustee;

g. To impose a constructive trust over the stock wrongfully sold by the Trustee;

h. For an award of attorney's fees as permitted by law, together with the costs and disbursements of this action, pursuant to Florida Statute Sections 736.1004, 736.1005 and 736.1006; and

i. For such other and further relief which to this Court seems just, proper, and equitable.

Dated: Miami, Florida
April 5, 2022

                                                           **PRYOR CASHMAN LLP**
*Attorney for Plaintiff Steven Stone*
Hans H. Hertell
Florida Bar No.71969
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: (786) 582-3011
Facsimile: (786) 582-3004
Email: hhertell@pryorcashman.com

*s/ Hans H. Hertell*